**CANTERBURY BELTS LTD, Plaintiff–Appellant,**

v.

**LANE WALKER RUDKIN, LIMITED, Defendant–Appellee.**

**No. 1037, Docket 88–7034.**

United States Court of Appeals, Second Circuit.

Argued April 28, 1988.

Decided Feb. 13, 1989.

---

Joel E. Lutzker, New York City (William Andes, Amster, Rothstein & Ebenstein, New York City, of counsel), for plaintiff-appellant.

James E. Sullivan, New York City (Alan K. Roberts, Roberts, Spiecens & Cohen, New York City, Joseph L. Strabala, San Francisco, Cal., of counsel), for defendant-appellee.

Before CARDAMONE, PRATT and MAHONEY, Circuit Judges.

MAHONEY, Circuit Judge:

This appeal presents for review an order of the United States District Court for the Southern District of New York, Charles S. Haight, Jr., *Judge*, denying the application of plaintiff-appellant Canterbury Belts Ltd. ("Canterbury"), a New York corporation, for an order of civil contempt, pursuant to 18 U.S.C. § 401(3) (1982), for violation of injunctive provisions in a 1982 consent decree. The decree was entered in an action alleging trademark infringement, unfair competition and false designation of origin brought by Canterbury against Lane Walker Rudkin, Limited ("Limited"). Contempt sanctions were sought against Limited, Lane Walker Rudkin Industries ("Industries"), the parent of Limited, and LWR Export, Ltd. ("Export"), another subsidiary of Industries which is the successor to Limited with respect to the activities at issue in this litigation. Limited, Industries and Export are corporations organized under the laws of New Zealand.

The consent decree provides that "[Limited] ..., and all persons acting in active concert or participation with it, shall cease and desist from all use of the term 'Canterbury' except as part of the composite 'Canterbury of New Zealand', with all elements being displayed in substantially equal prominence." The district court determined that Export's use of the trailing phrase "of New Zealand," in a design logo appearing on the exterior of at least one retail store and on various garments, was of sufficient size not to violate the "substantially equal" provision of the consent decree. The district court further deter-

mined that even where Export did not use the "trailer" at all in certain advertisements and trade show circulars, Canterbury had failed to show an intentional violation of the consent decree in the case of the advertisements, and had failed to prove economic injury or consumer confusion in the case of the trade show circulars. Relief was accordingly denied. Finally, the court held that service upon industries had not been sufficient to provide personal jurisdiction over that corporation, which does not do business in California or anywhere in the United States.

Reversed and remanded.

## Background

Canterbury is the owner of the trademark "Canterbury" on and in connection with diverse articles of men's and women's fashion accessories, including belts, watchbands, bracelets, wallets, cuff links and similar items. Limited used the trade names "Canterbury", "Canterbury of New Zealand" and "Canterbury/Lane Walker Rudkin" in connection with men's apparel. As a result, Canterbury sued Limited in 1981 for trademark infringement, unfair competition and false designation of origin. In April, 1982, the parties entered into a consent decree which included the following provisions:

3. As of and after January 1, 1983, defendant [Limited], its officer [sic], agents, servants, and employees, and all persons acting in active concert or participation with it, shall cease and desist from all use of the term "Canterbury" except as part of the composite "Canterbury of New Zealand", with *all elements* being displayed in *substantially equal prominence.*

4. Notwithstanding the provision in Paragraph 3 hereof, Defendant [Limited], and its officers, agents, servants, and employees, and all persons acting in active concert and participation with it, shall not use the term "CANTERBURY" including without limitation and by way of example as part of the composite "Canterbury of New Zealand" in connection with the sale of any products identified in Plaintiff's Registrations, namely, men's and women's belts for wearing apparel, credit card cases, pocket secretaries, wallets, watchbands, cuff links, key rings made in whole or in part of precious metal, key clips made in whole or in part of precious metal, money clips made in whole or in part of precious metal, tie clips and identification bracelets.

Emphasis added.

At some time before or after this consent decree was signed, Limited ceased doing business.[1] Export apparently succeeded to the operations and assets of Limited, and in any event conducted the activities which led Canterbury to seek contempt sanctions.

Contending that Limited and its privies had violated the consent decree, Canterbury moved for contempt sanctions in December, 1985. The district court ultimately determined that Export had used the word "Canterbury" without the qualifying phrase "of New Zealand" in advertisements for Export's clothing, and in listings of Export's products in trade show circulars. The district court also found that Export was currently using, on the exterior of at least one retail store and on various garments, the following design logo:

1. In its memorandum opinion and order dated December 4, 1986, the district court stated that: [W]hereas [Industries'] annual report for 1980 listed Limited as an existing subsidiary, the 1981 annual report does not list Limited, but does list Export. This suggests the possibility of a fraud being perpetrated on plaintiff and the Court when, in April 1982, defendant's counsel endorsed the consent judgment on behalf of Limited. Those instructions could presumably have come only from Industries, the parent.

CANTERBURY
OF NEW ZEALAND

Initially, however, by memorandum opinion and order dated December 4, 1986, the district court determined that by serving its motion papers upon Limited's counsel of record, Canterbury had obtained personal jurisdiction over Limited for the purpose of Fed.R.Civ.P. 65(d) proceedings to hold that corporation in contempt, but had not thereby obtained personal jurisdiction over Industries and Export. Canterbury thereupon purported to serve Export and Industries by service upon an officer of Export at Export's place of business in Foster City, California. In addition, Canterbury served Industries by registered mail, return receipt requested, from the clerk of the United States District Court for the Southern District of New York to Industries' home office in New Zealand pursuant to Fed.R.Civ.P. 4(i)(1)(D).

Subsequently, by memorandum opinion and order dated December 1, 1987, the district court determined that the attempted service upon Industries through Export's California office was insufficient to obtain personal jurisdiction over that corporation, which was not doing business in California or anywhere else in the United States.[2] Curiously, the district court did not address plaintiff's attempted Rule 4(i)(1)(D) service upon Industries. The court further determined that Limited had ceased doing business, but that "[g]iven

the corporate relationship and genesis of Export," Export was "in active concert or participation with" Limited within the meaning of Fed.R.Civ.P. 65(d), and was accordingly subject to the consent decree. The court then went on to address the merits of the contempt motion as against Export alone.

In denying that motion, the district court first noted that no violation of paragraph 4 of the consent decree was claimed, and only paragraph 3 thereof was at issue. It then determined that although the required appendage "of New Zealand" was in significantly smaller letters, Export's design logo did not violate the "substantially equal prominence" provision of paragraph three of the consent decree.

The court next addressed Export's use of the phrase "Canterbury" without the trailer "of New Zealand" in various advertisements and trade circulars. Addressing the advertisements, the court determined that Export had made "good faith efforts" to have them conform with the consent decree, that the violations resulted from the failure of third-party copy writers to follow Export's instructions, and that accordingly no contempt was shown. As to the trade circulars, Judge Haight concluded that there was no showing of "direct economic loss," in view of the difference between

---

**2.** The district court noted that although Export did not "formally concede" personal jurisdiction

in the Southern District of New York, it had "submit[ted] itself by consent" thereto.

Canterbury's and Export's product lines, and "no evidence of ... actual consumer confusion," again precluding a finding of contempt. Finally, the court ruled that the parties would bear their own costs and fees.

This appeal followed.

## Discussion

### A. *Construction of the Consent Decree.*

■ Consent decrees are to be construed as contracts. *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236–37, 95 S.Ct. 926, 934–35, 43 L.Ed.2d 148 (1975). Their meaning is ordinarily to be discerned within the "four corners" of the decree. As stated in *United States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971):

> Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve. *For these reasons, the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.*

*Id.* at 681–82, 91 S.Ct. at 1757 (footnote omitted) (emphasis partially added); *see Berger v. Heckler*, 771 F.2d 1556, 1568 (2d Cir.1985); *Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc.*, 341 F.2d 101, 102 (2d Cir.1965) (per curiam).

Nonetheless, "[a]ssuming that a consent decree is to be interpreted as a contract, it would seem to follow that evidence surrounding its negotiation and tending to explain ambiguous terms would be admissible in evidence." *ITT*, 420 U.S. at 238 n. 11, 95 S.Ct. at 935 n. 11 (quoting Handler, *Twenty-fourth Annual Antitrust Review*, 72 Colum.L.Rev. 1, 23 n. 148 (1972)). It was therefore appropriate for the district court, in interpreting the "substantially equal prominence" language of paragraph 3 of the consent decree, to consider the history of the decree's negotiation.

■ The district court noted that Canterbury initially proposed the language "equal prominence," but Limited successfully insisted upon the addition of the adverb "substantially." Reasoning that the "end result is grammatically suspect" and that "[s]trict equality either exists or it does not," the court concluded that:

> [A]s a practical matter ... the effect of the [consent decree] is to permit the phrase "of New Zealand" to appear in letters smaller than those used for "Canterbury," so long as the trailing phrase is not printed in letters so small as to delete it as a practical matter from the overall commercial message. Export has not departed from that standard.

We disagree, and regard as considerably more plausible Canterbury's contention that the amendment of the consent decree provided some limited flexibility from a standard of exact mathematical equality without authorizing a variation of the sort devised by Export. This is the plain, or generally prevailing, meaning of the terms employed, and we accordingly adopt it. *See International Union of Operating Eng'rs, Local 150 v. Flair Builders, Inc.*, 406 U.S. 487, 491, 92 S.Ct. 1710, 1712–13, 32 L.Ed.2d 248 (1972); *Berger v. Heckler*, 771 F.2d at 1568; Restatement (Second) of Contracts § 203(3)(a) (1981).

Furthermore, the concept of substantial equality has been given consideration in reapportionment cases which cast some light on the issue we must decide, despite the differing context. In *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), for example, the Su-

preme Court, in requiring "substantial equality of population among the various [legislative] districts," *id.* at 579, 84 S.Ct. at 1390, ruled that "[m]athematical exactness or precision" was not required, provided that the districts were "as nearly of equal population as is practicable," *id.* at 577, 84 S.Ct. at 1390; *see Gaffney v. Cummings,* 412 U.S. 735, 745–46, 93 S.Ct. 2321, 2327–28, 37 L.Ed.2d 298 (1973) ("substantial equality" consistent with "minor deviations from mathematical equality"); *Flateau v. Anderson,* 537 F.Supp. 257, 263 (S.D.N.Y.) (same), *appeal dismissed,* 458 U.S. 1123, 103 S.Ct. 5, 73 L.Ed.2d 1394 (1982).

We conclude (1) that the "substantially equal prominence" provision of paragraph 3 of the consent decree precludes use of the word "Canterbury" by Limited and its privies without appending the words "of New Zealand" in characters that are not significantly different in size or any other feature affecting the prominence of the display; and (2) that the design logo reproduced hereinabove, which purports to comply with paragraph 3 of the consent decree, does not satisfy this requirement.

### B. *Injury to Canterbury.*

■ As indicated earlier, the district court also considered Export's use of the phrase "Canterbury" without the trailer "of New Zealand" in various advertisements and trade circulars. The court concluded, as to the advertisements, that no showing of intentional violations had been made. This determination is not clearly erroneous, and we accordingly do not disturb it. We note, however, that sanctions for civil contempt can be imposed without a finding of wilfulness. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *NLRB v. Local 202, Int'l Bhd. of Teamsters,* 428 F.2d 994, 1001 (2d Cir.1970).

■ We do not concur in the district court's conclusion that as to the trade circulars, where intentional violations were found, no relief was appropriate. The district court's rationale was expressed in the following terms:

[T]he present evidence is insufficient to sustain a holding of contempt and attendant damages. Given the difference in the product lines, it is unlikely that plaintiff has suffered any direct economic loss. None is suggested in the present motion papers. As to source of the goods, plaintiff's evidence of "actual confusion" is confined to a single misdirected invoice from a trade show supplier of service. There is no evidence of no [sic] actual consumer confusion.

Canterbury submitted evidence of confusion, attached as exhibits to an affidavit of Canterbury's president, Frank M. Sobel, dated March 19, 1987, that went well beyond a "single misdirected invoice." Perhaps the district court considered the misdirected invoice to be the only evidence of confusion resulting from the trade show circulars, as distinguished from the composite logo which the district court considered, erroneously in our view, not to violate the consent decree. It is of particular concern that some of Canterbury's evidence related to defective merchandise supplied by Export but erroneously considered by its recipients to be Canterbury merchandise.

In any event, given our reversal of the construction of the consent decree, the question of damages and contempt sanctions should also be considered anew. We note in this regard that:

The district court is not free to exercise its discretion and withhold an order in civil contempt awarding damages, to the extent they are established.

Since the plaintiff should be made whole for the harm he has suffered, it is appropriate for the court also to award the reasonable costs of prosecuting the contempt, including attorney's fees, if the violation of the decree is found to have been willful.

*Vuitton et Fils S.A. v. Carousel Handbags,* 592 F.2d 126, 130 (2d Cir.1979) (citations omitted).

### C. *Personal Jurisdiction over Industries.*

■ Noting that service was attempted upon Export and Industries, Export's par-

ent, by serving an officer of Export at its offices in Foster City, California, the district court concluded that "[t]his service is not sufficient to obtain personal jurisdiction over Industries, a separate New Zealand corporation not doing business in California or anywhere else in the United States."

A district court cannot exercise personal jurisdiction over a nonparty to a litigation, on the basis that the nonparty is acting "in active concert or participation," within the meaning of Fed.R.Civ.P. 65(d), with a party who is subject to an injunction, unless personal jurisdiction is established over the nonparty. *Heyman v. Kline*, 444 F.2d 65 (2d Cir.1971); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2960, at 589 (1973). It has long been the rule that the standard to be applied in determining whether a federal district court has jurisdiction over the person in diversity cases is the law of the state where the court sits. *Fiedler v. First City Nat'l Bank of Houston*, 807 F.2d 315 (2d Cir.1986); *Arrowsmith v. United Press Int'l*, 320 F.2d 219 (2d Cir.1963) (in banc). It is now settled that the same rule applies in federal question cases where no federal statute makes specific provision for national service of process. *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987). Since no such provision has been made with respect to trademark infringement or unfair competition, *see* 2 J. McCarthy, Trademarks and Unfair Competition § 32.14, at 703 (1984), we accordingly turn to the law of New York.

Under New York law, where a corporate subsidiary is essentially a "separately incorporated department or instrumentality" of a foreign corporation, the activities of the subsidiary will be attributed to the foreign parent for purposes of determining the parent's amenability to personal jurisdiction in New York. *TACA Int'l Airlines, S.A. v. Rolls Royce, Ltd.*, 15 N.Y.2d 97, 204 N.E.2d 329, 256 N.Y.S.2d 129 (1965); *Kossoff v. Samsung Co.*, 123 Misc.2d 177, 474 N.Y.S.2d 180 (Sup.Ct.1984). The foreign parent may successfully contend on appropriate facts, of course, that its domestic subsidiary does not have adequate New

York contacts to confer jurisdiction over the parent, whatever the case may be in other domestic jurisdictions. *See Delagi v. Volkswagenwerk AG*, 29 N.Y.2d 426, 432, 278 N.E.2d 895, 897–98, 328 N.Y.S.2d 653, 657 (1972). We note in this regard, however, that Export has consented to jurisdiction in the Southern District of New York. *See supra* note 2.

Since it is conceded, and appears of record, that Export is a wholly owned subsidiary of Industries, it was inappropriate to conclude that Industries was not amenable to personal jurisdiction in New York solely because Industries, considered separately and apart from its subsidiary, does not engage in business in New York. This question will require further exploration upon remand.

If adequate contacts exist to subject Industries to personal jurisdiction in the Southern District of New York, service of process does not pose a separate problem. Whatever the validity of the purported service upon Industries by service upon an officer of Export at Export's California place of business, there appears to be no question that proper and effective service was separately made upon Industries pursuant to Fed.R.Civ.P. 4(i)(1)(D). *See Bancorp Leasing and Fin. Corp. v. Agusta Aviation Corp.*, 813 F.2d 272, 274 n. 3 (9th Cir.1987); *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff*, 638 F.Supp. 714, 725 (S.D.N.Y.1986); *Hunt v. Mobil Oil Corp.*, 410 F.Supp. 4, 9 (S.D.N.Y.1975).

### Conclusion

Reversed and remanded for further proceedings not inconsistent with this opinion.